IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TIMOTHY A. REA,                    :
         Plaintiff
                                   :

         vs.                       :    CIVIL NO. 1:CV-06-1920

                                   :
THE HERSHEY COMPANY 2005
ENHANCED MUTUAL SEPARATION PLAN, :
and THE HERSHEY COMPANY
         Defendants                :


*M E M O R A N D U M*

*I.   Introduction*

　　　　We are considering cross-motions for summary judgment
filed by the Plaintiff, Timothy A. Rea ("Rea"), and the
Defendants, The Hershey Company 2005 Enhanced Mutual Separation
Plan ("EMSP"), and the Hershey Company ("Hershey").  Rea, a
former Hershey employee, filed a three-count complaint alleging
wrongful denial of benefits, interference with ERISA rights, and
breach of contract.  Upon careful review of the motions, the
supplemental briefs, and the record, we will grant Defendants'
motion for summary judgment, deny Plaintiff's motion for summary
judgment, and enter judgment in favor of the Defendants.


*II.  Background*

     *A.  Procedural History*

　　　　Rea filed a complaint against Hershey and the Plan
Administrator of the 2005 EMSP.  (doc. 1).  After an unopposed

motion (doc. 14), Rea filed an amended complaint (doc. 17), naming Hershey and the EMSP.

Count I of the amended complaint alleges wrongful denial of benefits pursuant to section 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), based on the denial of Rea's application to participate in the EMSP, an ERISA plan which provided benefits to employees who voluntarily ended their employment with Hershey.[1]  Count II alleged that Hershey interfered with Rea's ERISA rights in violation of section 510, 29 U.S.C. § 1140.[2] Count III was a breach of contract claim based on compensation from other benefits plans that Rea would have received had Hershey approved his participation in the EMSP.  We dismissed Counts II and III in response to Defendants' motion to dismiss for failure to state a claim.  (doc. 21).

_____

[1]  Section 502(a)(1)(B) provides:
A civil action may be brought—(1) by a participant or beneficiary— . . .(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan; . . . .

[2]  Section 510 provides:
It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a [plan] participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled to under [an employee benefit plan], this subchapter, or the Welfare and Pension Plans Disclosure Act. . . .

In the remaining Count, Rea alleges that Hershey wrongfully denied his application to participate in the EMSP. (doc. 17, pp. 5-11).  After a period of discovery, the parties filed cross-motions for summary judgment.  (docs. 30, 31).  As discussed *infra*, we ordered supplemental briefing on an issue involving the exclusionary language in the EMSP (doc. 58), and the parties submitted briefs and exhibits (docs. 59-62).  The cross-motions for summary judgment are now ripe for our review.

   *B.  Factual Background*

     1.  Rea's Employment at Hershey

Rea was hired by Hershey on May 6, 1996, and worked in its marketing organization from 1996 to October 2005, after which he voluntarily resigned and accepted a position at another company.  Defendants' Statement of Material Facts ("Def. SMF"), ¶ 1; Plaintiff's Statement of Material Facts ("Pl. SMF") ¶ 1. Rea's claim concerns benefits he applied to receive upon his departure from Hershey in the fall of 2005.

From approximately November, 2001, through the fall of 2004, Rea served as Hershey's Director of Instant Consumables. Def. SMF ¶ 3.  In this position, Rea oversaw billion dollar portfolios of instant consumables and brand management, both of which were key strategic focus areas at Hershey.  Pl. Opp. to Def. SMF ¶ 4.  From the fall of 2004 through August, 2005, Rea was the Director of Chocolate Innovation.  Def. SMF ¶ 5.  In

this position, Rea was responsible for national launches of new Hershey products.  *Id*. ¶ 6; Pl. Opp. to Def. SMF ¶ 6.

On or about September 1, 2005, during a company-wide restructuring which included the marketing organization, Rea was reassigned to Director of Food and Beverage Enhancers and Special Trade Channels.  Def. SMF ¶ 7.  In this position, which Rea considered to be a "significant downgrade in responsibility and marginalization within the company," and not a strategic area, Pl. Opp. to Def. SMF ¶ 8, Rea managed the marketing of the grocery business, the vending trade class, the food service trade class, and the licensing area of the company.  Def. SMF ¶ 8; Pl. Opp. to Def. SMF ¶ 8.  Thomas Hernquist, Rea's supervisor and the Senior Vice President of U.S. Confectionary, and other Hershey managers believed that Rea's new position required an individual who could take a lot of initiative along with specific capabilities and experience possessed by few, if any, other Hershey employees.  Def. SMF ¶ 9; Pl. Opp. to Def. SMF ¶ 9.  Hernquist and other Hershey managers believed that Rea was suited for the position due to his decade-long experience in marketing at Hershey as well as the relationships he had developed serving as Director of Instant Consumables.  Def. SMF ¶ 10.  The position exposed Rea to a new area in Hershey's marketing organization.  *Id*. ¶ 11.

During Rea's nine years with Hershey, he received favorable performance reviews each year.  Def. SMF ¶ 2.  For the

year ending December 31, 2004, Rea's final full-year performance evaluation, Rea's performance was rated as "strong."  Pl. Opp. to Def. SMF ¶ 2; Def. SMF ¶ 15.  During his employment at Hershey, Rea was promoted to successively higher positions within its marketing organization and Hershey awarded him numerous pay raises.  Def. SMF ¶ 2.  Rea was also part of a succession plan prepared at least once a year for each Hershey department to ensure an adequate supply of individuals able to step in to key positions in the event of a vacancy.  *Id.* ¶ 14. In the spring 2005 succession plan, Rea was designated as fifth or sixth in the pipeline, showing him to be a "3-5 year candidate under the position of Vice-President, U.S. Confectionary, Refreshment Channel."  Def. SMF ¶ 13; Pl. Opp. to Def. SMF ¶ 13.

Despite Rea's strong 2004 performance evaluation and the succession plan, Hernquist rated Rea's performance as "effective" at a mid-year 2005 calibration session.  Pl. SMF ¶ 30.  At this session, Hernquist told Rea that he did not believe he was living up to his expectations, that his head was not in the game, and that he was not focused.  *Id.*  Hernquist told Chris Lansing, Rea's immediate supervisor at the time, that he thought Rea was lazy.  *Id.*  Lansing informed Rea of Hernquist's opinion.  *Id.* ¶ 31.  Hernquist also told Rea that he was not living up to his potential in early September of 2005. *Id.* ¶ 32.

### 2.  Hershey's Enhanced Mutual Separation Plan

In 2005, Hershey sought to reduce its overhead and lower costs by "streamlining" its workforce. Def. SMF ¶ 16.  To do so, on July 21, 2005, Hershey announced two voluntary separation plans: the Early Retirement Plan ("ERP") for employees ages 50 and over, and the Enhanced Mutual Separation Plan ("EMSP"), for certain salaried employees.  Id. ¶ 17.  The EMSP, the only plan relevant here, offered enhanced separation benefits to employees who terminated their employment pursuant to the plan requirements.  Id. ¶ 18.[3]

To request participation in the EMSP, the applicant and his manager had to agree on a proposed separation date from Hershey.  Id. ¶ 19.  By signing the EMSP Acceptance Form, the applicant acknowledged receipt of the 2005 EMSP Plan Document and its summary plan description and he acknowledged that receipt of benefits was conditioned upon signing a separation agreement as well as receiving approval from the Hershey Executive Team ("HET").  Id. ¶ 20; Pl. Opp. to Def. SMF ¶ 20.[4]

---

[3]  Among other benefits, EMSP participants were eligible to receive: (1) separation pay consisting of three weeks of base pay for each year of employment; (2) participation in Hershey's retirement plan for the duration of the separation period; (3) full vesting of all stock options granted to the employee through the Key Employee Incentive Plan ("KEIP"); and, pursuant to the Annual Incentive Plan ("AIP"), (4) payment of Hershey's annual bonus for 2005; and (5) payment of a prorated portion of the 2006 annual bonus.  See doc. 37, tab E (2005 EMSP Plan Document and Summary Plan Description).

[4]  The EMSP provided the following definition of "HET": "'HET' means the Hershey Executive Team, which consists of certain executives as designated by the Company."  (doc. 37, tab E, p. 2).

Once the applicant and manager agreed on a proposed separation date and signed the form, the applicant submitted the form to the Hershey WorkLife Center.  Def. SMF ¶ 21.

### 3.  EMSP Eligibility Criteria

EMSP benefits were only available to applicants who met certain conditions.  Def. SMF ¶ 24.  Pursuant to one of the exclusionary provisions in the EMSP plan document, an applicant could be denied participation if the HET determined that the employee's termination of employment would have an "adverse affect" on Hershey's ongoing business operations.[5]  *Id.*; Pl. Opp. to Def. SMF ¶ 24.  Specifically, the EMSP defined an "Eligible Employee" as "any Employee who meets the conditions set forth in Section C. and who is not excluded from coverage under Section D."  Def. SMF ¶ 25.  Section D(2) contained the exclusionary provision at issue here.  *Id*. ¶ 26.  That section provided:

> Notwithstanding anything herein to the contrary, the Company retains the right to deny participation in the Plan to: (I) any otherwise Eligible Employee if the HET determines that the termination of employment of such employee will have an adverse affect on the Company's ongoing business operations, or (ii) any formerly highly compensated employee of the Company as determined by the Plan Administrator. Such a determination will be made in the sole discretion of the HET or Plan Administrator, as applicable.

---

[5]  As discussed *infra* at Part IV.A, the parties briefed whether this term could be reformed to read "adverse effect."

*Id.*  The HET, in evaluating an EMSP application pursuant to this provision, considered whether elimination of the applicant's position, the loss of the applicant's skills, and the corresponding reduction in headcount in the applicant's business unit would be adverse to Hershey's business operations.  *Id.* ¶ 27.  Hernquist and Marcella Arline, two HET members, testified that they considered a number of factors in evaluating the effect of an employee's departure on Hershey's ongoing business operations.  *Id.* ¶ 28.  These factors included: the employee's job performance, the scope of the employee's responsibility, other requests to participate in the EMSP from the same business unit, and the overall reduction in headcount in the employee's business unit.  *Id.* ¶ 28.  Another factor influencing the HET's decision was that Hershey could not fill the position vacated by an employee who departed under the EMSP; the position could not be "backfilled" by hiring or transferring another employee into the vacated position.  Def. SMF ¶¶ 29, 30; Pl. Opp. to Def. SMF ¶ 29.  Instead, Hershey had to eliminate the position.  Def. SMF ¶ 29.

> ### 4.  Rea's 2005 EMSP Application

Rea submitted his application to participate in the EMSP on August 29, 2005.  Def. SMF ¶ 32; Pl. Opp. to Def. SMF ¶ 32.  The Acceptance Form provided that Rea and Hernquist agreed that Rea's separation date from Hershey would be September 30, 2005.  Def. SMF ¶ 33; Pl. Opp. to Def. SMF ¶ 33.  Hernquist also

served as the HET member in charge of Rea's business unit.  Def. SMF ¶ 34.[6]  On August 31, 2005, Hernquist signed the Acceptance Form in his capacity as Rea's supervisor, agreeing to a September 30, 2005, separation date.  *Id*. ¶¶ 35, 36; Pl. Opp. to Def. SMF ¶ 36.  Hernquist could not recall whether he discussed a later separation date with Rea in order to give Hershey more time to fill the position.  Pl. SMF ¶ 8; Def. Opp. Pl. SMF ¶ 8. On September 1, 2005, the Hershey Company Worklife Center received Rea's Acceptance Form, Separation Agreement, and General Release.  Pl. SMF ¶ 10.

After submitting the EMSP Acceptance Forms, Hernquist reviewed Rea's EMSP application pursuant to the factors listed above.  Def. SMF ¶ 37.  Hernquist concluded that he would recommend denial of the application because Rea's position at Hershey—a director-level position—was "critical."  Def. SMF ¶ 39; Pl. Opp. to Def. SMF ¶ 38.  According to Hernquist, his group "was already stretched in terms of not enough staffing." Def. SMF ¶ 40a.  Additionally, permitting Rea to depart under the EMSP would result in one fewer director at Hershey due to the HET policy of not backfilling positions vacated by individuals participating in the EMSP.  *Id*. ¶ 40b.  Only one other director-level employee in Hernquist's business unit had

---

[6]  At the time Rea submitted his EMSP application he was still the Director of Chocolate Innovation.  On September 1, 2005, after he had submitted the application but before the HET considered it, Rea was reassigned to Director of Food and Beverage Enhancers and Special Trade Channels.  Rea Depo., pp. 39-40.

applied for the EMSP. *Id*. ¶ 41. Hernquist used similar reasoning in recommending denial of her application. *Id*. ¶ 42.

The HET met on September 21, 2005, to consider EMSP applications, including Rea's. *Id*. ¶ 43. At the time, the HET consisted of eleven individuals, including Burton Snyder, David West, Marcella Arline, and Thomas Hernquist. Pl. SMF ¶ 12. There are no notes from the HET meeting; however, there is a spreadsheet listing the applicants and the result for each application. *Id*. ¶ 13; Def. Opp. Pl. SMF ¶ 13. Hernquist was asked at the meeting whether Rea's application met the HET's criteria. Arline Depo., pp. 36-37. The HET talked to Hernquist about Rea's position at Hershey, including whether it was a position which could be eliminated, whether the position was needed if Rea vacated it, and how Rea was performing at Hershey. *Id*. at 37. The HET relied on the particular member from the applicant's department—Hernquist in Rea's case—in determining whether the applicant's position could be eliminated. Def. Opp. Pl. SMF ¶ 14.

Hernquist told the HET that Rea held a position at Hershey which could not be eliminated. Pl. SMF ¶ 15. Hernquist also informed the HET that Rea's most current performance appraisal rating was strong. *Id*. Hernquist's recommendation to the HET was to reject Rea's EMSP application. *Id*. ¶ 16. The HET members trusted the recommendations of other HET members. Def. Opp. to Pl. SMF ¶ 17. With respect to Hershey employees in

Hernquist's area of the company, the HET accepted all of Hernquist's recommendations concerning their EMSP applications. Def. Opp. to Pl. SMF ¶ 17.  The HET did not hold a formal vote on Rea's EMSP application.  Pl. SMF ¶ 17; Def. Opp. to Pl. SMF ¶ 17.

            5.  Hershey's Notification of the HET Decision

            On September 26 or 27, 2005, Eric Lent, who had become Rea's supervisor at the time, orally informed Rea that his EMSP application had been rejected.  Def. SMF ¶ 45.  A formal letter, dated September 28, 2005, and received on September 30, 2005, from the Hershey WorkLife Center notified Rea that he had been rejected, explaining that his "position was not eliminated (in your group's reorganization) and the Company would like you to continue in your position." *Id*. ¶ 46.  Arline confirmed that this was the reason for the rejection of Rea's EMSP application. Pl. SMF ¶ 18.  A copy of Rea's EMSP application form was included with the September 28, 2005, letter with an indication that it had been rejected.  Def. SMF ¶ 47.  The application form, signed by Marcella Arline, a member of the HET and the Hershey Employee Benefits Committee, noted: "For critical business needs, the employee's request to participate in the EMSP has been rejected." *Id*. ¶ 48.  Notwithstanding Hershey's request that he continue in his position, Rea ended his employment at Hershey on September 30, 2005, as agreed on the EMSP Acceptance Form.  *Id*. ¶¶ 49, 50.

### 6.  Rea's Appeal of the EMSP Denial

On October 10, 2005, Rea, through counsel, appealed the denial of his EMSP application.  Pl. SMF ¶ 20.  Hershey's Employee Benefits Committee ("EBC"), the EMSP Plan Administrator, consisting of Marcella Arline, Burton Snyder, and David West, *id*. ¶ 21, met to consider Rea's appeal.  On November 28, 2005, the EBC, by letter, informed Rea that it had upheld the denial of his EMSP application.  Pl. SMF ¶¶ 24, 25.

On January 25, 2006, Rea, again through counsel, appealed the November 28, 2005, EBC decision.  Def. SMF ¶ 55; Pl. SMF ¶ 26.  EBC members may have discussed this appeal in person, by telephone, or by email.  Pl. SMF ¶ 27; Def. Opp. to Pl. SMF ¶ 27.  The EBC notified Rea of the denial of his second appeal by letter dated March 21, 2006.  Pl. SMF ¶ 28.

Within days of Rea's departure, Hershey began to consider the functions of his position and who might be able to perform them.  Def. Opp. to Pl. SMF ¶ 35.  By January 2006, Hershey split Rea's responsibilities among four employees.  *Id*.; Pl. SMF ¶ 35.

### III.  *Legal Standard for Summary Judgment Motions*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, we may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In reviewing the evidence, we must construe facts and inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 553 (1986). Summary judgment must be entered for the moving party "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.* at 586-87 (citations omitted).

The moving party bears the initial responsibility of stating the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. It can discharge that burden by "showing . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

An issue is "genuine" "only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Childers v. Joseph*, 842 F.2d 689, 693-94 (3d Cir. 1988) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). A fact is "material" when it would affect the outcome of the trial under the governing law. *Anderson*, 477 U.S. at 248.

When a moving party has carried the burden under Rule 56(e), the burden shifts to the nonmoving party to demonstrate that an issue of material fact exists.  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87 (citations omitted).  The nonmoving party "must present *affirmative evidence* in order to defeat a properly supported motion for summary judgment," and "cannot simply reassert factually unsupported allegations contained in [the] pleadings." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citation omitted).  "If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).  Factual averments in briefs do not satisfy the nonmoving party's burden. *Harter v. GAF Corp.*, 967 F.2d 846, 852 (3d Cir. 1992).

IV. *Discussion*

A. *Reformation of the 2005 EMSP*

After the parties filed cross-motions for summary judgment, we ordered supplemental briefing regarding possible reformation of the exclusionary provision in the 2005 EMSP. *See* doc. 58.  As noted, the provision allowed the HET to deny an application if it "determine[d] that the termination of employment of such employee w[ould] have *an adverse affect* on

14

the Company's ongoing business operations . . . ."   (doc. 37, tab E, p. 5) (emphasis added).   Rea focuses on the "adverse affect" language in arguing that the denial of his application did not comply with the standard set forth in this provision. *See* doc. 44, pp. 19, 22-23; doc. 57, pp. 8-9; doc. 47, pp. 10-11.   Hershey counters by arguing that the inclusion of "affect" was "plainly a mistake in spelling or a typographical error in the Plan document," and should instead be "effect."   *See* doc. 54, pp. 3-4.   *See also* doc. 56, p. 4, n.3.   We required the parties "to brief whether the use of 'affect' in the EMSP was a scrivener's error subject to reformation . . . ."   (doc. 58, pp. 2-3).   Resolving this issue will frame our examination of whether the HET's reasons for denying Rea's EMSP application met the standard in the exclusionary provision.

The equitable doctrine of reformation of contract permits correction of a scrivener's error in an ERISA plan document in certain limited circumstances.   In *Int'l Union of Elec. Workers v. Murata Erie N. Am.*, 980 F.2d 889 (3d Cir. 1992), the Third Circuit explained that an ERISA plan document may be reformed "based upon parol evidence, provided the evidence is 'clear, precise, convincing and of the most satisfactory character' that a mistake has occurred and that the mistake does not reflect the intent of the parties."   *Id*. at 907.   The *Murata* court also focused on the statutory purpose underlying ERISA, including it in its reformation analysis.

Highlighting ERISA's statutory goal of "insur[ing] that 'every

employee may, on examining the plan documents, determine exactly

what his rights and obligations are under the plan,'" *id*.

(quoting *Frank v. Colt Indus., Inc.*, 910 F.2d 90, 97 (3d Cir.

1990)), the court noted that

> [a]llowing the doctrine of scrivener's error
> to apply in ERISA cases would seem at odds
> with this statutory purpose.  A plan
> document containing a scrivener's error
> might mislead an employee into believing he
> had rights or obligations that he did not,
> in fact, have.  If, on the other hand, the
> employer were bound by the plan documents,
> whether or not they contained errors, the
> employee would know precisely his
> obligations and rights upon reading the
> plans.

*Id*.  Later, in *Cent. Penn. Teamsters Pension Fund v. McCormick*

*Dray Line, Inc.*, 85 F.3d 1098 (3d Cir. 1996), the court

reiterated the importance of ERISA's statutory purpose when

considering reformation, explaining:

> The central holding of *Murata*'s "scrivener's
> error" discussion is that in circumstances
> where a court can establish that no plan
> participants were likely to have relied upon
> the scrivener's error in question in
> determining their rights and obligations
> under the plan, allowing reformation of the
> scrivener's error does not thwart ERISA's
> statutory purpose of ensuring that plan
> participants can rely upon the language.

*Id*. at 1105 n.2.

Pursuant to *Murata* and *McCormick*, we must consider the

evidentiary standard as well as ERISA's statutory purpose before

reforming the EMSP.  Having reviewed the parties' submissions

16

and considered ERISA's statutory purpose, we conclude that Hershey has met its burden and we may reform the "adverse affect" language in the EMSP.

In support of reforming the language Hershey first offers an affidavit from Kathryn M. McGrath, Hershey's Vice President for Total Compensation and Benefits. *See* doc. 59, at tab B. McGrath, whose job duties include "overseeing the creation and implementation of employee benefits plans," was involved in the drafting of the 2005 EMSP. *Id*. ¶¶ 2, 3. According to McGrath, Hershey did not intend to include the word "affect" in the subject clause and its inclusion was an inadvertent misspelling of the word "effect." *Id*. ¶ 5. Hershey also refers to the testimony of Marcella Arline, Hershey's Chief People Officer, that EMSP decisions were based on whether an employee's termination would have an adverse "effect" on Hershey's business operations. (doc. 59, p. 5).

Documentary evidence also supports Hershey's position. A document attached to a letter sent by Arline to Hershey employees summarizing the EMSP explained that Hershey "ha[d] the right to reject your request based on business needs." *Id*. Another document attached to the same letter provided that the employee, manager, and HET "must mutually agree whether an employee's desired termination of employment under the EMSP can be accommodated given the ongoing business needs of the Company (such as staffing levels, performance and expertise in any given

17

department)." *Id.* at 6.   Third, Hershey submitted the 2001 EMSP

plan document.   It provided:

> Notwithstanding anything herein to the
> contrary, the Company retains the right to
> deny participation in the Program to any
> otherwise Eligible Employee if the Company
> determines that the Employee's Termination
> of Employment with the Company *will have an
> adverse effect on the Company's ongoing
> business operations*.   Such a determination
> will be made by the HET in its sole
> discretion and any such determination shall
> be made on a non-discretionary basis.

*Id.* at 7 (quoting doc. 59, tab E) (emphasis added).[7]

With respect to ERISA's statutory purpose, we are

aware of the importance of allowing plan participants to read

and rely on plan documents for their rights and obligations.

*See McCormack*, 85 F.3d at 1105 n.2 (discussing *Murata*).

However, reformation of a plan document does not contravene this

policy goal if a court can determine that it is unlikely that

plan participants relied upon the scrivener's error.   *See id.*

In *Murata*, the Third Circuit made this determination because the

scrivener's error was a provision that was omitted from the plan

document.   *Murata*, 980 F.2d at 907.   The provision at issue

---

[7]   Hershey also submitted an affidavit from Burton Snyder,
Hershey's General Counsel; however, the parties appear to have
stipulated that Hershey would not use Snyder as a witness.   *See* doc.
62, p. 7, n.1.   Hershey argues that the stipulation does not apply to
the supplemental briefing because the issue had not been raised at
the time of the discovery.   (doc. 60, p. 2).   Hershey also argues
that it has presented sufficient evidence to meet its evidentiary
burden without relying on Snyder's testimony.   *Id.* at 2-3.   We need
not resolve whether Snyder's testimony is admissible because we agree
that it is not necessary for resolution of the scrivener's error
issue.

concerned the distribution of excess pension funds to the employer instead of the employee.  *See McCormack*, 85 F.3d at 1104 (discussing *Murata*).  Due to the absence of the provision, a participant could not have read the plan documents and believed that participants would receive the distribution.  *Id.* at 1104-05.  Without such reliance, the court could reform the plan document.[8]  *Id.*

Here, because adherence to the plain meaning of "affect"—the word claimed to be a scrivener's error—renders the exclusionary provision nearly incomprehensible, we view it as unlikely that Rea or other prospective EMSP participants would have relied on the error.  As Hershey argues, reading the exclusionary provision with the dictionary definitions of "affect" makes the provision almost unintelligible.  *See* doc. 59, p. 8.  When used as a noun, "affect" has the following definitions:

> I. Senses relating to the mind.
>      1. a. The manner in which one is inclined
> or disposed; (also) the capacity for willing
> or desiring; a mental state, mood, or
> emotion, esp. one regarded as an attribute
> of a more general state; a feeling, desire,
> intention. Obs.
>      b. An inner disposition or feeling
> (rather than an external manifestation or
> action); intent, intention, earnest,
> reality. Contrasted with cheer and effect.
> Obs.

---

[8]  Despite deciding that the doctrine of reformation could be applied, the Third Circuit remanded the case so that the district court could consider whether a scrivener's error had occurred. *Murata*, 980 F.2d at 908.

c. More generally: a disposition, temper; a natural tendency. Obs.

2. a. Feeling towards or in favour of a person or thing; kindly feeling, affection; (also) an instance of this. Obs.
b. Biased feeling, partiality. Obs.

3. A desire or appetite; spec. a passion, lust, or evil desire. Obs.

4. An affectation, a trick. Obs.

5. a. Philos. An emotional, unreflective response. Obs.
b. Psychol. (and Psychiatry). A feeling or subjective experience accompanying a thought or action or occurring in response to a stimulus; an emotion, a mood. In later use also (usu. as a mass noun): the outward display of emotion or mood, as manifested by facial expression, posture, gestures, tone of voice, etc.

II. Senses relating to the body.
6. An abnormal state of the body; a disease or disorder; = AFFECTION n.1 7. Obs.
7. gen. The manner in which something is physically affected or disposed; spec. the actual state or disposition of the body. Obs.

*Oxford English Dictionary Online*, "affect, *n.*" (2008).  Using any of these definitions in the exclusionary provision hardly makes sense.  As it is used here, "effect" has the following definition: "operative influence; a mode or degree of operation *on* an object."  *Oxford English Dictionary Online*, "effect, *n.*" (2008).  Comparing the two definitions, we view it as unlikely that a plan applicant or participant would read the exclusionary provision and conclude that receipt of EMSP benefits would depend upon a determination that his departure would not have an

adverse affect—as that term is defined above—on Hershey's business operations.[9]  Thus, while the factual circumstances presented here are distinct from those in *Murata*, we believe that the rationale for allowing reformation of the scrivener's error is the same.  As a result, we will reform the scrivener's error in the exclusionary provision in the EMSP, changing the term "affect" to "effect."

  *B.  Standard of Review*

   We next consider the standard of review to apply to the HET's decision to deny Rea's EMSP application.  The thrust of the parties' difference on this point concerns the appropriate level of scrutiny.  Hershey argues that the most exacting scrutiny we may apply is "non-fiduciary arbitrary-and-capricious" review based on a breach of contract standard.  (doc. 35, p. 13, n.2).  On the other hand, Rea argues that we should engage in de novo review of the denial decision, consistent with the sliding-scale approach used to review a fiduciary benefits decision discussed in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989) and *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377 (3d Cir. 2000).  *See* doc. 44, pp. 6-14.

---

[9]  Related to this point, *Merriam-Webster's Dictionary of English Usage* provides: "[B]oth *affect* and *effect* are nouns.  Even though *effect* is the only one in common use (*affect* is a technical term in psychology), *affect* is sometimes put in its place."  *Merriam-Webster's Dictionary of English Usage* 41 (1994).

Our analysis begins with whether Rea's EMSP decision was a business decision or a fiduciary decision.  The relevant provision of the 2005 EMSP provides:

> the Company retains the right to deny participation in the Plan to: (I) any otherwise Eligible Employee if the [Hershey Executive Team] determines that the termination of employment of such employee will have an adverse [e]ffect on the Company's ongoing business operations . . . .  Such a determination will be made in the sole discretion of the HET . . . .[10]

According to Hershey, "the HET was not acting as a plan fiduciary when it made the decision to deny Mr. Rea separation under the EMSP for business reasons." (doc. 35, p. 13). Instead, the HET—a group of high-level Hershey employees—was making a decision regarding whether Rea's departure would have adverse consequences for Hershey's business operations.  Rea counters that we are not reviewing a business decision authorized by the EMSP because "the HET never made the necessary determination of an **adverse affect** on the Company's ongoing business operations." (doc. 47, p. 10) (emphasis in original). Additionally, according to Rea, Third Circuit case law does not permit deference to a business decision if it is not authorized by the benefits plan or if it is based on erroneous facts. *Id.* at 9.

---

[10]  As discussed *supra*, we have reformed the word "affect" to read "effect" in the exclusionary provision.

We view Rea's arguments as pertaining to whether the benefits determination complied with the EMSP language.  These arguments, however, do not address the initial issue of whether the HET's decision was a business decision or a fiduciary decision.  Rea's arguments are more appropriately considered in evaluating the HET's decision-making after determining the applicable standard of review.

The Third Circuit discussed the distinction between a business decision and a fiduciary decision in *Noorily v. Thomas & Betts Corp.*, 188 F.3d 153 (3d Cir. 1999).  The *Noorily* court explained that "to the degree that the plan gives an employer discretion, the employer is not a fiduciary when it makes determinations according to the plan's terms that affect employees' eligibility for benefits." *Id.* at 158.  Pursuant to the benefits plan in *Noorily*, the employer agreed to pay severance benefits to employees who were "involuntarily terminated" when "the terminating manager believe[d] the granting of such pay [wa]s appropriate." *Id.* at 156.  The benefits committee was obligated to implement the terminating manager's decision. *Id.* at 159.  Thus, because

> the plan gave this discretion to [the company] as an employer through its terminating manager rather than as an administrator through its Corporate Benefits Committee, [the company] . . . was not acting in a fiduciary capacity when it determined that granting severance benefits . . . would not be 'appropriate' because it was not in [the company's] interest to do so."

*Id*.  Consequently, the court did not apply the standards associated with judicial review of decisions by administrators or fiduciaries with discretion to administer an ERISA plan.  *See id*.  Instead, the court considered whether the company, as an employer, acted arbitrarily and capriciously in determining whether payment of severance pay was appropriate.  *Id*. at 160.[11]

Under the EMSP plan terms, the HET had a similar measure of discretion in making a business decision concerning an employee's eligibility for benefits.  Pursuant to the EMSP, the HET possessed the "sole discretion" to make a determination whether a prospective participant's termination would have "an adverse [e]ffect on [Hershey's] ongoing business operations." Notably, this discretion rested with the HET, not the EMSP Plan Administrator.  *See* doc. 37, tab E, p. 5.  Thus, in challenging the decision to deny his EMSP application, Rea is contesting the HET's exercise of its discretion under the terms of the EMSP, not discretion exercised by the EMSP Plan Administrator. Therefore, we are reviewing a business decision, not a fiduciary decision.  *See Noorily*, 188 F.3d at 158 (employer does not act as a fiduciary when making business decisions allowed for by a plan even though its determinations affect employees' eligibility for benefits).  As the HET was acting in a business

---

[11]  As noted by Hershey, the *Noorily* court did not actually hold that an arbitrary and capricious standard of review was required. *See Noorily*, 188 F.3d at 160.  Instead, the court explained that it could not impose a standard more exacting than arbitrary and capricious review and that a "bad faith" standard of review may have been appropriate.  *Id.*

capacity when making its EMSP decision, we shall apply the arbitrary and capricious standard discussed in *Noorily*.

       C.  *Hershey's Denial of Rea's Application
          to Participate in the EMSP*

       In applying the arbitrary and capricious standard to the denial of Rea's application, we examine the HET's conduct as an employer, not as a fiduciary. *See id.* at 160. In this regard, "[c]learly, there is a class of decisions that might be arbitrary when considered from the point of view of a plan participant that are perfectly appropriate for an employer." *Id.* As Hershey notes, under arbitrary and capricious review, we do not consider whether Hershey could have concluded that Rea's separation would not adversely affect its business operations. (doc. 54, pp. 6-7). Rather, we consider whether the record supports the HET's conclusion that Rea's departure would have an adverse effect on Hershey's ongoing business operations. Applying this standard, we conclude that the denial decision was not arbitrary and capricious.

       Hershey points to the adverse effects of Rea's departure cited by Thomas Hernquist—Rea's supervisor—supporting his recommendation to deny Rea's EMSP application. First, Rea's position as a director had a "larger scope of responsibility" and was "more critical to the company." Hernquist Depo., p. 60. According to Hernquist, Rea's position was "unusual, and it required a specific capability and experience within the company." *Id.* at 36. Second, Rea's group, according to

Hernquist, "was already stretched in terms of not enough staffing." doc. 35, p. 7; Hernquist Depo., p. 59. With the HET's policy of not hiring to fill a position vacated through the EMSP—a practice Hershey called "backfilling," *see* Arline Depo., p. 40—Rea's departure would have resulted in fewer directors in his business unit. doc. 35, p. 7; Hernquist Depo., p. 59.[12]

At the HET meeting where Rea's application was considered, HET members asked Hernquist whether Rea's EMSP application met its criteria. Arline Depo., pp. 36-37. Hernquist recommended that the HET reject Rea's application and then discussed Rea's position at Hershey, including whether it was to be eliminated through Hershey's restructuring as well as whether it was needed if Rea was not in the position. *Id*. at 37. Hernquist also discussed Rea's job performance. *Id*. Upon Hernquist's recommendation that Rea's position was critical to Hershey, the HET rejected his EMSP application. *Id*. at 41-42.

_____

[12] Rea argues that the HET's practice of not backfilling positions vacated through the EMSP shows a lack of good faith in making its EMSP determination. (doc. 47, p. 14). We disagree. As Hershey explained to its employees, the EMSP (as well as an Early Retirement Plan) was offered as a way of "streamlining Hershey's workforce through <u>voluntary</u> means." (doc. 37, tab D, ex. 1). *See also* "The Hershey Company Overview of 2005 Enhanced Mutual Separation Plan", Arline Depo., ex. 2 (describing the EMSP as "a voluntary workforce reduction program"). Thus, considering backfilling comports with Hershey's goal for the EMSP. Additionally, we view the HET's prohibition on backfilling for EMSP participants as informing its determination of whether an applicant's departure would have an adverse effect on Hershey's business. While this policy was not explicitly set forth in the plan document, we do not think its consideration is inconsistent with the ultimate determination the HET was required to make for each EMSP applicant.

In doing so, Mr. Rea was informed that his "position was not eliminated (in your group's reorganization) and the Company would like you to continue in your position."    Arline Depo., ex. 5.  An attachment to the denial letter stated: "For critical business needs, the employee's request to participate in the EMSP has been rejected."  *Id*. at ex. 6.

The HET, in reaching its decision, relied on Hernquist's assessment of the adverse consequences which would result from Rea's departure.  The HET, given the discretion by the EMSP to make a business decision, determined that it would not be in Hershey's interest for Rea to leave the company. Under an arbitrary and capricious standard of review, we cannot conclude that the HET's decision was without reason or fact.

Rea's arguments to the contrary fail to create a genuine issue of material fact regarding the HET's denial decision.  First, Rea contends that the HET did not actually determine that his departure from Hershey would have "an adverse affect" on Hershey's business.  *See* doc. 44, p. 18.  As discussed in Part IV.A, we have reformed the language of the exclusionary provision such that it required a determination that Rea's departure would have an adverse effect on Hershey's business.  To the extent that Rea argues Hershey's denial decision was not a verbatim recitation of the reformed language in the exclusionary provision, we view the denial letter and its

attachment as reflecting a decision by the HET in conformity with the EMSP.

Rea also contends that Hernquist criticized Rea's performance during a mid-year review, yet later advised the HET that Rea's position was critical at Hershey. (doc. 47, p. 12).[13] Rea argues that given the HET's reliance on Hernquist's opinion, his comments undermine the basis for the HET's rejection of Rea's application. *Id*. at 12-13. But Rea does not dispute the other factors cited by Hernquist that resulted in the HET's conclusion that Rea's position at Hershey was critical to its business. According to Hernquist, Rea's director-level position had more responsibility and was more critical to Hershey than other positions. *See supra*, at 26-27. Hernquist also explained that the staffing in Rea's group was already stretched thin and losing Rea would have resulted in fewer directors in Hernquist's business unit. *Id*. These concerns, which the HET relied on in making its decision, *id*. at 27-28, permit the conclusion that Rea's departure would have an adverse effect on Hershey's business. Therefore, we do not believe that Rea's argument creates a genuine issue of material fact as to

---

[13] Hernquist told Rea that he was not living up to expectations, his "head wasn't in the game," and he was not focused. Pl. SMF ¶ 30. Hernquist also informed Rea's direct supervisor, Chris Lansing, that he believed Rea to be lazy. *Id*. ¶¶ 30, 31.

whether the HET's denial decision was arbitrary and capricious.[14]

Rea also points to an error in his job title on the sheet used to track consideration of EMSP applications as undermining the basis for the HET's decision.  (doc. 47, p. 13).  The sheet listed Rea's position as "Director, Chocolate Innovation."  *Id*.  This was the position Rea held when he submitted his EMSP application; however, prior to the HET meeting, Rea was reassigned to Director of Food and Beverage Enhancers and Special Trade Channels.  *Id*.  Rea argues that the mistaken job title shows that the HET considered the wrong position when it evaluated Rea's application.  *Id*.  Rea concludes that the HET's mistaken reliance on a position he no longer held undermines the explanation in its rejection letter that Rea's EMSP application was denied because his position was not eliminated in the reorganization.  *Id*.  Instead, the record shows that Hernquist evaluated Rea's application according to his new position, *see* doc. 56, ex. A, p. 82, and that the HET relied on Hernquist's assessment of the effect of Rea's departure.  *See* Arline Depo., p. 42.

Rea's final two arguments do not show that the HET's decision was arbitrary and capricious.  First, the absence of

---

[14]  Additionally, despite Hernquist's criticism, Rea was rated as a "strong" performer at his 2004 annual review and an "effective" performer at his 2005 mid-year review, both ratings which Rea himself considered to be "favorable."  (doc. 54, p. 9).  Arline testified that even an average employee's EMSP application would have been rejected if he had a position which could not be eliminated.  *Id*.

notes from the HET meeting does not show that the denial decision was arbitrary and capricious.  Rea does not point to anything in the record that would have required the HET to record notes on EMSP application decisions.  Second, in an apparent attempt to illustrate that Rea's departure did not have negative consequences for Hershey's business, Rea notes that his position as Director of Food and Beverage Enhancers and Channels "went unfilled during this last quarter of 2005." (doc. 44, p. 21).  Hershey explains that four individuals filled the position's responsibilities in January 2006.  As it pertains to Rea's claim, we do not think that the length of time it took to fill the position Rea vacated or its responsibilities shows that the HET's decision was arbitrary and capricious.

*V.    Conclusion*

        When considering Rea's EMSP application, the HET's decision regarding the effect of Rea's departure on Hershey's ongoing business operations was a business decision subject to arbitrary and capricious review.  The record supports Hershey's position that the HET viewed Rea's director-level position as critical to Hershey's business.  Having reviewed the record as well as Rea's arguments, we cannot say that the HET's decision was arbitrary and capricious.  Accordingly, we will grant the Defendants' motion for summary judgment and enter judgment in

favor of Hershey and the Hershey Company 2005 Enhanced Mutual Separation Plan.

                              /s/William W. Caldwell
                              William W. Caldwell
                              United States District Judge

Date: July 15, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


TIMOTHY A. REA,                    :
        Plaintiff
                                   :

        vs.                        :    CIVIL NO. 1:CV-06-1920

                                   :
THE HERSHEY COMPANY 2005
ENHANCED MUTUAL SEPARATION PLAN,:
and THE HERSHEY COMPANY
        Defendants                 :


*ORDER AND JUDGMENT*


        AND NOW, this 15th day of July, 2008, upon

consideration of Plaintiff's Motion for Summary Judgment (doc.

31), Defendants' Motion for Summary Judgment (doc. 30), and

pursuant to the accompanying Memorandum, it is ordered that:

        1.  Plaintiff's Motion for Summary
        Judgment is denied;

        2.  Defendants' Motion for Summary
        Judgment is granted;

        3.  Judgment is entered in favor of the
        Defendants;

        4.  Defendants' letter motions for oral
        argument (docs. 53 & 63) are dismissed as
        moot;

        5.  The Clerk of Court shall close this
        file.


                              /s/William W. Caldwell
                             William W. Caldwell
                             United States District Judge